**UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| IN THE MATTER OF THE SEARCH | : | Magistrate No. |
| OF THE TWELVE ELECTRONIC | : | |
| DEVICES ASSOCIATED WITH | : | |
| DOUGLAS GLANCY, STORED AT | : | |
| THE OFFICES OF THE CHILD | : | |
| EXPLOITATION AND | : | |
| OBSCENITY SECTION OF THE | : | |
| DEPARTMENT OF JUSTICE | : | |

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT**

I, Christopher Janczewski, of the Internal Revenue Service (IRS), being duly sworn under

oath, do hereby depose and state:

1.      I am a Special Agent of the IRS, Criminal Investigation ("IRS-CI") and have been

so employed since September 2009.   As a special agent, my responsibilities include the

investigation of criminal violations of the Internal Revenue Code (Title 26, United States Code),

the Money Laundering Control Act (Title 18, United States Code), the Bank Secrecy Act (Title

31, United States Code), and related offenses.   Prior to my employment as a special agent, I was

a revenue agent in the Examination division of the IRS for three years.   My education includes a

Bachelor's Degree in Accounting from Central Michigan University in Mt. Pleasant,

Michigan.   As a special agent, I attended approximately 26 weeks of special agent training at the

Federal Law Enforcement Training Center ("FLETC"), Glynco, Georgia, in various aspects of

criminal investigations dealing specifically with criminal law, criminal tax law, money

laundering, wire fraud, seizure, and various financial investigative techniques.   I have training

and experience in the enforcement of the laws of the United States, including the preparation,

presentation, and service of arrest and search warrants.   I am currently assigned to the Cyber

1

Crimes Unit of IRS-CI, have received training in criminal schemes perpetrated via the internet and I hold a Global Information Assurance Certification of Information Security Fundamentals. I have also consulted extensively with agents and subject-matter experts who have experience investigating child-pornography cases.

2.      Your affiant respectfully submits this affidavit in support of an application for a warrant to search twelve electronic devices associated with Douglas Glancy, located at the offices of the Child Exploitation and Obscenity Section of the U.S. Department of Justice, 1400 New York Avenue, Sixth Floor, Washington, D.C.   For the reasons set forth in the affidavit, there is probable cause to believe that instrumentalities, fruits, and evidence of violations of Title 18, United States Code, Sections 2252(a)(2) (Receipt of Child Pornography) and 2252(a)(4)(B) (Possession of Child Pornography), are located on these devices.   I am requesting authority to search the entire contents of the devices specified in Attachment A and to seize all items listed in Attachment B as instrumentalities, fruits, and evidence of crime.

## FACTS AND CIRCUMSTANCES

3.      The statements in this affidavit are based in part on my investigation of this matter, information conveyed to me by other law enforcement officers, and the expertise of other law-enforcement officers also familiar with child pornography and child-sexual exploitation investigations and cases.    I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 2252(a)(2) and (a)(4)(B) are present in the electronic evidence that was taken from Douglas Glancy's person during a border inspection on October 23, 2017, and during a search of Glancy's residence at 811 4th Street., N.W., Apt. 904, Washington, D.C. on

October 25, 2017.   All 12 devices are associated with Douglas Glancy ("GLANCY") and include the following ("TARGET DEVICES"): **an Apple iPad**; **three thumb drives**; **a second Apple iPad** (A 1673) (serial number DMPRDAGNHMN); **a Lexar 1000x 128 GB SD card**; **one Lexar 1000x 64 GB SD card**; **one Apple iPhone (A1784, BCG-E3092A)**; **one Go Pro Camera**; **one Sony Camera (ILCE-6500) (serial number 3384382)**; **one Apple MacBook (A1398) (serial number C2QNN008696Q); and one SanDisk 32 GB storage device**.   The Apple iPad was taken from GLANCY's apartment at 811 4th Street N.W., Apt. 904, Washington, D.C.; the remaining items were detained during the above-referenced border inspection, described in greater detail below.   The items are currently in the custody of the U.S. Government, who now seeks authority to search their contents.

## RELEVANT DEFINITIONS

4.      The following definitions apply to this Affidavit and Attachment B:

a.      "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver.   Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation.   This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

b.      "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors in sexually explicit poses or positions.

c.      "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

d.      "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, and mobile phones and devices.   See 18 U.S.C. § 1030(e)(1).

e.      "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.   Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

f.      "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data.   Data security devices may consist of hardware, software, or other programming code.   A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards.   Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.   Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

g.      "Internet Protocol address" or "IP address," as used herein, refers to a unique number used by a computer or other digital device to access the Internet.   IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer every time it accesses the Internet.   IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet.

h.      "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet.   ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.

i.      "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

j.      "Mobile applications," as used herein, are small, specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including engaging in online chat, reading a book, or playing a game.

k.      "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

l.      "Remote Computing Service" ("RCS"), as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

m.      "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person.

n.      "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of

conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

o.      Whois: A "Whois" search provides publicly available information as to which entity is responsible for a particular IP address or domain name. A Whois record for a particular IP address or domain name will list a range of IP addresses that that IP address falls within and the entity responsible for that IP address range and domain name. For example, a Whois record for the domain name XYZ.COM might list an IP address range of 12.345.67.0– 12.345.67.99 and list Company ABC as the responsible entity. In this example, Company ABC would be responsible for the domain name XYZ.COM and IP addresses 12.345.67.0– 12.345.67.99.

## **BACKGROUND ON COMPUTERS AND CHILD PORNOGRAPHY**

5.      Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

6.      Child pornographers can transfer photographs from a camera onto a computer-readable format with a scanner.   With digital cameras, the images can be transferred directly onto a computer.   A modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection.   Electronic contact can be made to literally millions of computers around the world.

7.      The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography.   The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last

several years.   These drives can store thousands of images at very high resolution.

8.      The Internet and its World Wide Web afford collectors of child pornography several different venues for obtaining, viewing and trading child pornography in a relatively secure and anonymous fashion.

9.      Collectors and distributors of child pornography also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! and Google, among others.   The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats.   A user can set up an online storage account from any computer with access to the Internet.   Evidence of such online storage of child pornography is often found on the user's computer.   Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer in most cases.

10.     As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes.   Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files.   Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others).   In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used.   A forensic examiner often can recover evidence suggesting whether a computer contains peer to peer software, when the computer was sharing files, and some of the files which were uploaded or downloaded.   Such

information is often maintained indefinitely until overwritten by other data.

## BACKGROUND ON TOR, BITCOIN, AND DARKNET MARKETS

11.     **Tor:** Tor is a computer network designed specifically to facilitate anonymous communication over the Internet.   To access the Tor network, a user must install Tor software either by downloading an add-on to the user's web browser or by downloading the free "Tor browser bundle," which is available at www.torproject.org.[1]   Tor effectively bounces a user's communications around a distributed network of relay computers all over the world, making conventional methods of identifying users obsolete.[2]   Additionally, entire websites on Tor can be set up as "hidden services," which operate as ordinary public websites do, with one critical exception -- the IP address (and thus, the location) of the web server is hidden and replaced with a Tor-based web address.   This address is comprised of a series of algorithm-generated characters, such as "asdlk8fs9dflku7f" followed by the suffix ".onion."   A user can only reach these "hidden services" if the user is using the Tor client and operating in the Tor network. And unlike an open Internet website, it is not possible to determine through public lookups the IP address of a computer hosting a Tor "hidden service."   Neither law enforcement nor users can therefore determine the location of the computer that hosts the website through those public lookups.   Though this anonymizing process slows down internet traffic for the user, users generally sacrifice speed for

---

[1]      Users may also access Tor through so-called "gateways" on the open Internet; however, use of those gateways does not provide users with the anonymizing benefits of the Tor network.   Additional information outlining Tor and how it works is publicly accessible at www.torproject.org.

[2]      When a user on Tor accesses a website, the signal bounces around until it exits the network of computers via an "exit node."   The internet-protocol ("IP") address of the exit node (as opposed to the user's actual IP address) appears on the website's IP log.   Currently, there is no practical method to trace a user's actual IP address back through that Tor exit-node IP address.   Tor makes it extremely difficult for law enforcement to identify and locate a website-host's administrators or users' actual IP addresses and/or physical locations.

anonymity when engaging in illicit conduct on the Tor network.

12.     **BITCOIN:**   Bitcoin ("BTC") is a type of virtual currency, circulated over the internet as a form of value.[3]   BTC are not issued by any government, bank, or company, but rather are controlled through computer software operating via a decentralized, peer-to-peer network. BTC is just one of many varieties of virtual currency.

13.     BTC are sent to and received from BTC "addresses."   A BTC address is somewhat analogous to a bank account number and is represented as a 26-to-35-character-long case-sensitive string of letters and numbers.   Each BTC address is controlled through the use of a unique corresponding private key, a cryptographic equivalent of a password or pin needed to access the address.   Only the holder of an address' private key can authorize any transfers of BTC from that address to other BTC addresses.   Users can operate multiple BTC addresses at any given time, with the possibility of using a unique BTC address for each and every transaction.

14.     To transfer BTC to another address, the sender transmits a transaction announcement, cryptographically signed with the sender's private key, across the peer-to-peer BTC network.   The BTC address of the receiving party and the sender's private key are the only pieces of information needed to complete the transaction.   These two keys by themselves rarely reflect any identifying information.   As a result, little-to-no personally identifiable information about the sender or recipient is transmitted in a BTC transaction itself.   Once the sender's transaction announcement is verified, the transaction is added to the blockchain, a decentralized public ledger that records all BTC transactions.   The blockchain logs every BTC address that has

---

3  Since Bitcoin is both a currency and a protocol, capitalization differs.   Accepted practice is to use "Bitcoin" (singular with an uppercase letter B) to label the protocol, software, and community, and "bitcoin" (with a lowercase letter b) to label units of the currency. That practice is adopted here.

ever received a BTC and maintains records of every transaction for each BTC address.

15.     While the identity of the BTC address owner is generally anonymous (unless the owner opts to make the information publicly available), analysis of the blockchain can often identify the owner of a BTC address.   The analysis can also reveal additional addresses controlled by the same individual or entity.   For example, a user or business may create many BTC addresses to receive payments from different customers.   When the business wants to move the BTC that it has received, it may group those addresses together to send a single transaction.   Analysis of the blockchain information associated with such a transaction would indicate that each of those addresses was, in fact, part of a "cluster" of BTC addresses controlled by a single entity.   This analysis allows law enforcement and the private sector alike to gain insight into all of the addresses associated with a company.   Several companies specializing in blockchain analysis create large databases for building these clusters and offer software products to facilitate this sort of analysis.

16.     To acquire BTC, a typical user will purchase them from a BTC exchanger.   A virtual currency exchange is a business that allows customers to trade virtual currencies for other forms of value, such as conventional fiat money (*e.g.,* U.S. dollar, Russian ruble, €).   Exchanges can be brick-and-mortar businesses (exchanging traditional payment methods and virtual currencies) or online businesses (exchanging electronically transferred money and virtual currencies).   Virtual currency exchanges doing business in the United States are regulated under the Bank Secrecy Act and must collect identifying information of their customers and verify their clients' identities.

17.     Since the blockchain serves as a searchable public ledger of every BTC transaction, investigators may trace transactions to BTC exchangers.   Since those exchangers collect

identifying information about their customers, subpoenas or other appropriate process submitted

to these exchangers can reveal the true identity of the individual responsible for the transaction.

18.    **DARKNET:**   Darknet markets are commercial websites operating as Tor hidden

services that primarily function as black markets, selling or brokering transactions involving drugs,

unlicensed pharmaceuticals, cyber-arms, weapons, counterfeit currency, stolen credit-card details,

forged documents, illegal pornography, and other illicit goods.   BTC, the most common method

of payment for products or services within darknet markets, is generally exchanged on a darknet

market as follows:

      a.   Centralized method - all transactions pass through the darknet market's

          BTC addresses; the darknet market takes a commission; and, the vendor

          receives their payment from the darknet market.

      b.   Decentralized method - transactions take place directly between buyer and

          seller.[4]

19.    Searches and seizures of evidence from computers commonly require agents to

download or copy information from the computers and their components, or seize most or all

computer items (computer hardware, computer software, and computer related documentation) to

be processed later by a qualified computer expert in a laboratory or other controlled

environment.   This is almost always true because of the following:

      a.   Computer storage devices (like hard disks, diskettes, tapes, laser disks,

          magneto opticals, and others) can store the equivalent of thousands of

---

[4]     Ebay is an example of a centralized market while Craigslist is an example of a decentralized market.

pages of information.   Especially when the user wants to conceal criminal

evidence, he or she often stores it in random order with deceptive file

names.   This requires searching authorities to examine all the stored data

to determine whether it is included in the warrant.   This sorting process

can take days or weeks, depending on the volume of data stored, and it

would be generally difficult to accomplish this kind of data search on site;

and

b.   Searching computer systems for criminal evidence is a highly technical

process requiring expert skill and a properly controlled environment.   The

vast array of computer hardware and software available requires even

computer experts to specialize in some systems and applications, so it is

difficult to know before a search which expert should analyze the system

and its data.   The search of a computer system is an exacting scientific

procedure which is designed to protect the integrity of the evidence and to

recover even hidden, erased, compressed, password-protected, or

encrypted files.   Since computer evidence is extremely vulnerable to

tampering or destruction (which may be caused by malicious code or

normal activities of an operating system), the controlled environment of a

laboratory is essential to its complete and accurate analysis.

20.     In order to fully retrieve data from a computer system, the analyst needs all

magnetic storage devices as well as the central processing unit (CPU).   In cases involving child

pornography where the evidence consists partly of graphics files, the monitor(s) may be essential

for a thorough and efficient search due to software and hardware configuration issues.   In addition, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media).

21.     In addition, there is probable cause to believe that the computer and its storage devices are all instrumentalities of the crime(s), within the meaning of Title 18 U.S.C. Section 2252 and should all be seized as such.

## CHILD PORNOGRAPHY COLLECTOR CHARACTERISTICS

22.     I know based on my training, experience, and consultation with agents and subject-matter experts who have experience investigating child-pornography cases that most individuals who are sexually attracted to children facilitate their sexual arousal through imagery that focuses, in part or in whole, on children.   Specifically, these individuals often collect child pornography.   These individuals may derive sexual gratification from actual physical contact with children as well as from fantasy involving the use of pictures or other visual depictions of children or from literature describing sexual contact with children.   The overriding motivation for the collection of child pornography may be to define, fuel, and validate the collectors most cherished sexual fantasies involving children.   Visual depictions may range from fully clothed depictions of children engaged in non-sexual activity to nude or partially nude depictions of children engaged in sexually explicit conduct.

23.     In addition to child pornography, these individuals are also highly likely to collect other paraphernalia related to their sexual interest in children.   This other material is sometimes referred to as "child erotica," which is defined as any material relating to children that serves a

sexual purpose for a given individual.   It is broader and more encompassing than child pornography, but at the same time the possession of such corroborative material, depending on the context in which it is found, may be behaviorally consistent with the offender's orientation toward children and indicative of his sexual intent.   It includes things such as fantasy writings, letters, diaries, drawings, cartoons and non-sexually explicit visual images of children.

24.     Child pornography collectors reinforce their fantasies, often by taking progressive, overt steps aimed at turning the fantasy into reality in some or all of the following ways:   collecting and organizing their child related material; masturbating while viewing the child pornography; engaging children, online and elsewhere, in conversations, sometimes sexually explicit conversations, to fuel and fortify the fantasy; interacting, both directly and indirectly, with other like-minded adults through membership in organizations catering to their sexual preference for children thereby providing a sense of acceptance and validation within a community; gravitating to employment, activities and/or relationships which provide access or proximity to children; and frequently persisting in the criminal conduct even when they have reason to believe the conduct has come to the attention of law enforcement.     These are need-driven behaviors to which the offender is willing to devote considerable time, money, and energy in spite of risks and contrary to self-interest.

25.     Persons with a sexual interest in children often maintain and possess their material in the privacy and security of their homes or some other secure location, such as a private office or work computer, where it is readily available.   The collection may include sexually explicit or suggestive materials involving children, such as photographs, magazines, narratives, motion pictures, video tapes, books, slides, drawings, computer images or other visual media.   Because

they put so much time and energy into obtaining the material, they do not delete or destroy their collections.

26.     Based on the information set forth in this affidavit, I submit that there is probable cause to believe the target is a collector of child pornography, and thus, evidence of violations of Title 18 United States Code Section 2252 will be located on the target devices.

**SEARCH METHODOLOGY TO BE EMPLOYED**

27.     To search for electronic data contained in computer hardware, computer software, and/or memory storage devices, the examiners will make every effort to use computer forensic software to have a computer search the digital storage media. This may include the following techniques (the following is a non-exclusive list, as other search procedures may be used):

a.     Searching for image files to locate images of children engaging in sexually explicit conduct, examining log files associated with the receipt, transmission, and viewing of such images, and examining all of the data contained in such computer hardware, computer software, and /or memory storage devices to view the data and determine whether that data falls within the items to be seized as set forth herein;

b.     Surveying various file directories and the individual files they contain;

c.     Searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable

will not be returned unless law enforcement personnel have determined that

the data is not (1) an instrumentality of the offenses, (2) a fruit of the

criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5)

evidence of the offenses specified above);

        d.      Opening files in order to determine their contents;

        e.      Scanning storage areas;

        f.      Performing keyword searches through all electronic storage

areas to determine whether occurrences of language contained in such

storage areas exist that are likely to appear in the evidence described in

Attachment B; and/or

        g.      Performing any other data analysis technique that may be

necessary to locate and retrieve the evidence described in Attachment B.

## THE INVESTIGATION

### A. The Website Background

28.     "The Website" is an online child-pornography website located on the darknet with

a Tor-based web address known to law enforcement.   The Website, which is the largest child-

pornography website on the darknet, is used to host and distribute child pornography.[5]

29.     Any user has the ability to create a free profile by providing a username and

password.   Once the user has an account, the user can browse previews of videos that are

---

[5]     The actual name of "The Website" is known to law enforcement.   The Website remains active and
disclosure of the name of The Website would potentially alert its users to the fact that law enforcement action is
being taken against users of The Website, thereby provoking users to notify other users of law enforcement action,
flee, and/or destroy evidence.   Accordingly, to protect the confidentiality and integrity of the ongoing investigation
involved in this matter, specific names and other identifying factors have been replaced with generic terms and the
website will be identified herein as "The Website."

available for download and can post to a website chat.[6]   In order to download videos from the

site, however, the user must use "points," which are allocated to users by The Website.   A user

can earn points by uploading videos depicting the sexual exploitation of children, referring new

users, or paying for a "VIP" account, which lasts for approximately six months and is priced at

0.03 BTC (approximately $97.77 USD as of October 17, 2017).   The Website assigns each user

a unique BTC address where the user can send funds for purchasing account privileges.   The

user can only redeem the points by downloading videos from The Website; the points are not

transferable to any other website or application.   Once a user sends BTC to The Website, the

BTC cannot be refunded or redirected; the BTC can only be redeemed by downloading videos.

The site is similar to a centralized market save one exception – all of the BTC is taken by the

administrator.

30.      Each video available for download has a title, a description (if added by the

uploader), tags with further descriptions for locating with The Website's search function, and a

preview thumbnail image containing approximately 16 still images from the video.   Of

particular note is the fact that the upload page on The Website clearly mandates: "Do not upload

adult porn." The Website has over 115,000 unique videos available for downloading.   In order

to prevent duplicate videos from being uploaded, The Website hashes the new video, compares

the hash to hashes of previously uploaded videos, and only allows new videos to be uploaded.[7]

The videos stored on The Website account for nearly seven terabytes of data that has been

---

6        However, all users identified to date have paid BTC to The Website and thus, had access to view and
download the sexually-explicit, child-pornography videos.

7        For example, "Secure Hash Algorithm Version 1 hash value" (SHA 1 hash value) is an algorithm that processes
digital files, resulting in a 160-bit value that is unique to that file.   It is computationally infeasible for two files with
different content to have the same SHA 1 hash value.   By comparing the hash values of files, it can be concluded
that two files that share the same hash value are identical with a precision that exceeds 99.9999 percent certainty.
There is no known instance of two different child pornographic images or videos having the same SHA1 hash value.

downloaded by users over 1,030,000 times.   As a point of comparison, seven terabytes of data would fill roughly 10,486 CD-ROM discs.

31.     Examples of video files on The Website include a top downloaded video entitled "japan rape.avi" that is approximately ten minutes long.   This video was uploaded to the site by user "123412" with the description of "Admin Upload."   Your affiant believes that based on the description of "Admin Upload," this video was uploaded to the site by the site's administrator. Your affiant reviewed the preview stills of the video.   The video depicts a prepubescent Asian girl approximately ten years old.   The child is naked with her hands duct taped to her ankles on either side.   A naked adult male vaginally penetrates the child's vagina and inserts multiple object into the child's vagina at the same time.

32.     Another top downloaded video is entitled "VID-20140907-WA-001.wmv" and is approximately eight and a half minutes long.   This video was uploaded to the site by user "umamed" with the description of "8yo anal fucked pussy."   Your affiant reviewed the preview stills of the video.   The video depicts a prepubescent girl between the ages of six and eight years old.   The child's underwear is pulled down around her thighs and she is wearing a blue t-shirt. The child is positioned on all fours while a naked adult male penetrates the child's vagina with his penis from behind.   The adult male repositions the child and then moves the child in several different positions while continuing to penetrate her vagina with his penis.

33.     Other examples of videos from The Website include depictions of toddlers and infants engaged in sexually explicit conduct.   For example, your affiant reviewed the still images of a video entitled "rape toddler girl.mpg," which is approximately one minute and twenty-three seconds long.   The video was uploaded to the site by user "anonymous," who is one of the top uploaders to the site.   The video depicts a toddler girl between the ages of two and

three years old.   The video shows the child being anally penetrated by an adult male while she cries into her hands.   The video zooms in to focus on the toddler's vaginal area as the adult male penis penetrates the toddler's anus.

34.     Your affiant also reviewed the still images of a video entitled "americanDad.mkv," which is approximately thirty-three minutes and forty-four seconds long. This video was uploaded to the site by user "nyugiss1," who has uploaded over seventy videos to the site.   The video depicts a baby approximately six months old who is holding an adult penis. In another still frame, the adult male is holding his penis and inserting his penis into the baby's mouth.   In the last still frames, the adult male is forcing his penis into the baby's anus.   These are examples of the types of videos The Website traffics in.

35.     On the video search page of The Website, there is a list of keyword search terms and the number of videos associated with the keyword.   Some of the top keyword search terms and the associated approximate videos are as follows:

| **Keyword** | **Videos** |
| --- | --- |
| PTHC (short for preteen hardcore) | 10,967 |
| PEDO (short for pedophile) | 7,407 |
| 2yo% | 4,541 |
| %4yo | 4,205 |
| Rape | 3,671 |
| Incest | 3,215 |

**B. Investigation**

36.     IRS-CI analyzed BTC addresses associated with The Website and identified

nearly 3,000 unique BTC addresses believed to be controlled by The Website ("The Website cluster").   From approximately October 2015 to present, The Website cluster has received over 1,500 payments totaling approximately 268 BTC worth approximately $221,563.   Of these payments, over 1,300 were sent to The Website directly from addresses associated with virtual currency exchanges.   Over two hundred of these payments were sent from accounts held at U.S. Exchange 1 in the United States.   A subpoena to this exchange yielded records for these accounts, including customer names as well as additional identifiable information.   Most of the individuals reside in the United States.   Approximately 22 exchange accounts had BTC sent to The Website with a note connected to the transaction listing what appears to be a username on The Website or other information further connecting the transaction to The Website (*e.g.,* "[The Website] VIP" and "for User: karoass (230 downloads)").   Investigators then sent subpoenas to other US BTC-wallet providers ("Exchanges") for records to include Know Your Customer documents and transactional history.   These Exchanges are legally obligated to maintain these records.

37.      When authorities subpoenaed U.S. Exchange 1 for records of wallets that sent BTC to The Website., subpoena returns from US Exchange 1 revealed GLANCY created one of these BTC wallets that authorities determined had sent BTC to The Website.   GLANCY's account was created on or about March 10, 2014.   GLANCY provided his first and last name, SSN, DOB, a current address of 811 4th St NW, Apt. 904, Washington, D.C. 20001, and a verified phone number and email address.   This information has been corroborated by other sources. GLANCY also linked his US Exchange 1 account to a checking account ending in -9070 at United States Senate Federal Credit Union ("USS-FCU") and two credit cards in his name.   GLANCY's US Exchange 1 account purchased approximately 9.66432101 BTC, which

is valued at approximately $4,559.63 at the times of purchase.

38.     GLANCY's US Exchange 1 account conducted approximately four transactions of sending BTC to The Website.   The first transaction occurred on or about October 11, 2015 for approximately 0.34 BTC valued at approximately $83.87.   The Website asks for 0.01, 0.02, or 0.03 BTC as payment   for points.   These points can then be used by the user to download more videos from The Website's child-pornography collection.   Therefore, the more points a user has, the greater number of videos the user can download.     The subsequent three transactions occurred approximately as follows:

| Date | BTC | USD |
|------|-----|-----|
| 10/30/2015 | 0.13 | $42.89 |
| 03/26/2016 | 0.1 | $41.65 |
| 04/30/2016 | 0.09 | $40.76 |

39.     Based on law-enforcement analysis of the marketplaces that received BTC from this wallet, authorities determined that GLANCY had sent BTC directly and indirectly from his US Exchange 1 account to darknet markets known for primarily selling illegal drugs, including seven transactions totaling approximately 2.61684 BTC (approximately $800.87) to Agora Market and three transactions totaling approximately 0.614686 BTC (approximately $624.27) to Dream Market.   The most recent transactions were two sends to Dream Market on approximately March 1, 2017.

40.     Subpoena returns from U.S. Exchange 1 further showed that on or about March, 26, 2016 GLANCY's US Exchange 1 account sent approximately 0.15 BTC (approximately $62.55) to BM-2cWuGyQQUgTUYWNcJiVUn82Lip2Qxoy2cf@bitmessage.ch.   This BTC address was discussed in a forum where users corresponded about child-exploitation and child

pornography websites.   The discussions within the forum noted that this BTC address was

known to be used by Website 2, another darknet website.   The discussions additionally provided

the darknet address for Website 2.   As of September 11, 2017, Website 2 was still operating.

The home page describes the site as offering "real blackmail, real rape, real forced and a lot more

rare videos of girls."   Users can either contribute new material to the site's administrator,

preferably material that they personally produced (and thus, in violation of 18 U.S.C. Section

2251(a)) or provide BTC in exchange for access to over 1,700 videos that contains videos of

child pornography.

   41. Additionally, subpoena returns from PayPal revealed an account that was

registered with GLANCY's email address of dglancy@umich.edu and connected to GLANCY's

checking account ending in -9070 at USS-FCU, which was used to purchase high-end

photography equipment, image-editing software, and an online, image-storing service.   Based

on my discussions with subject-matter experts in the area of child exploitation and child

pornography, I am aware that such equipment is often used in the production of child

pornography.

   42. Subpoena returns further showed that GLANCY sent BTC to a merchant

associated with the name "Daofile" and the email address of daofile.com@gmail.com.

Additionally, GLANCY received an email to his bitcoin1822@gmail.com account from

depfile.com.   Depfile.com and Daofile.com are file-hosting and files-sharing providers.   Law

enforcement discovered a forum post listing depfile.com and daofile.com as sites used to host

and share child pornography.   Both sites are known to law enforcement as being used to host

child pornography in previous investigations.   Based on my discussions with subject-matter

experts in the area of child exploitation and child pornography, I know that persons in receipt of

child pornography often store them in online, file lockers, which allow them to view and store those files on their personal devices.

      43.    On or about Monday, October 23, 2017, law enforcement conducted a border inspection of GLANCY as he traveled inbound to the United States from the Philippines, which based on my training and experience and discussions with subject-matter experts in the area of child exploitation, is a known destination for child-exploitation and child sexual trafficking.   As part of the border inspection, law enforcement detained GLANCY's laptop, personal cellphone, and other electronic devices (including video-recording devices).   These TARGET DEVICES were specifically as follows: **three thumb drives**; **an Apple iPad** (A 1673) (serial number DMPRDAGNHMN); **a Lexar 1000x 128 GB SD card**; **one Lexar 1000x 64 GB SD card**; **one Apple iPhone (A1784, BCG-E3092A)**; **one Go Pro Camera**; **one Sony Camera (ILCE-6500) (serial number 3384382)**; **one Apple MacBook (A1398) (serial number C2QNN008696Q); and one SanDisk 32 GB storage device**.   Based on my training and experience and discussions with subject-matter experts in this field, I know that items such as the Go Pro camera and the Sony camera are often used in the production of child pornography.   Often, these depictions are subsequently stored on thumb drives and SD cards, such as the TARGET DEVICES that GLANCY had in his possession upon his return from the Philippines.   Subsequent to the imaging of these items, law enforcement contacted GLANCY to obtain passwords so that they could access the electronic devices.   GLANCY returned the phone call from a phone number that was associated with the U.S. Exchange 1 account used to send BTC to The Website.   As such, law enforcement has reason to believe that GLANCY still had in his possession an alternate cellphone that was used to further his illegal activity.   Based on my training and experience, I know that individuals often maintain separate personal devices that they use to

facilitate their illicit activity.

44.     On or about October 25, 2017, at approximately 5:00 a.m., GLANCY is believed to have emailed his sister.   In the email, GLANCY stated that law enforcement had taken possession of his electronic devices and because of that, he was going to commit suicide.   Soon thereafter, GLANCY fell to his death from the balcony of his residence.

45.     On October 25, 2017, after Glancy's death, law enforcement obtained a search warrant for his residence.   *See* 1:17-mj-781 (DAR) (Sealed).   This warrant authorized a search of GLANCY's apartment for evidence relating to child pornography based on the above evidence that GLANCY had frequently provided bitcoin to The Website in order to download additional child pornography videos, had shown a sexual interest in children based on his other bitcoin activities and on-line discussions, and had just returned from a clandestine trip to the Philippines. Just prior to the execution of the search warrant, members of the Metropolitan Police Department ("MPD") took possession of an Apple iPad (listed previously) that was found in the apartment, near the balcony from which GLANCY fell, fully charged and turned on.   I retrieved that iPad from MPD and personally delivered it to the offices of the Child Exploitations and Obscenity Section of the Department of Justice, where it is presently stored.

46.     The TARGET DEVICES remained in the custody of the Department of Homeland Security until October, 30, 2017, when they were transferred to the offices of the Child Exploitation and Obscenity Section at 1400 New York Ave NW, Washington, D.C.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

47.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.   Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.   This information can sometimes be recovered with forensic tools.

48.     There is probable cause to believe that things that were once stored on the Device may still be stored there, for at least the following reasons:

      a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.   Electronic files downloaded to a storage medium can be stored for years at little or no cost.   Even when files have been deleted, they can be recovered months or years later using forensic tools.   This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

      b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.   In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

      c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of

how a computer has been used, what it has been used for, and who has used

it.   To give a few examples, this forensic evidence can take the form of

operating system configurations, artifacts from operating system or

application operation, file system data structures, and virtual memory

"swap" or paging files.   Computer users typically do not erase or delete

this evidence, because special software is typically required for that task.

However, it is technically possible to delete this information.

    d.   Similarly, files that have been viewed via the Internet are sometimes

       automatically downloaded into a temporary Internet directory or "cache."

49.   *Forensic evidence.*   As further described in Attachment B, this application seeks

permission to locate not only electronically stored information that might serve as direct

evidence of the crimes described on the warrant, but also forensic evidence that establishes how

the Device was used, the purpose of its use, who used it, and when.   There is probable cause to

believe that this forensic electronic evidence might be on the Device because:

    a.   Data on the storage medium can provide evidence of a file that was once

       on the storage medium but has since been deleted or edited, or of a deleted

       portion of a file (such as a paragraph that has been deleted from a word

       processing file).   Virtual memory paging systems can leave traces of

       information on the storage medium that show what tasks and processes

       were recently active.   Web browsers, e-mail programs, and chat programs

       store configuration information on the storage medium that can reveal

       information such as online nicknames and passwords.   Operating systems

can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.  Forensic evidence on a device can also indicate who has used or controlled the device.   This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.   Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.   Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f.  From my discussions with subject-matter experts in this field, I know that when an individual uses a digital device to: visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography, child erotica, or information pertaining to an interest in child pornography or child erotica, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.   The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense.   The digital device is also likely to be storage medium for evidence of crime.   From my discussions with subject-matter experts, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

50.  *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent

29

with the warrant.   The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

51.   *Manner of execution.*   Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.   Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## REQUEST FOR SEALING

52.   It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.   I believe that sealing this document is necessary because the warrant is relevant to an ongoing investigation into The Website and not all of the targets of this investigation will be searched at this time.   Based upon my training and experience, I have learned that, online criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through child exploitation discussion forums.   Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

## CONCLUSION

53.     Based on the foregoing, I, Special Agent Christopher Janczewski, respectfully submit that there is probable cause to believe that evidence and instrumentalities of the offense of Receipt and Possession of Child Pornography, in violation of 18 U.S.C. § 2252, are present and stored in the 12 electronic devices that are currently stored at the offices of the Child Exploitation and Obscenity Section of the Department of Justice.   I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the listed items.


_____
SPECIAL AGENT CHRISTOPHER JANCZEWSKI
INTERNAL REVENUE SERVICE


Subscribed to and sworn before me on this __31st__ day of October, 2017.


_____
HONORABLE DEBORAH A. ROBINSON
UNITED STATES MAGISTRATE JUDGE